# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 16, 2011

Lyle W. Cayce
Clerk

United States Courts
Southern District of Texas
FILED

AUG 0 2 2011

David J. Bradley, Clerk of Court

No. 09-41294

In the Matter of: DAVIS OFFSHORE, L.P.;
DAVIS PETROLEUM PIPELINE, L.L.C.;
DAVIS PETROLEUM CORPORATION;
DAVIS OFFSHORE HOLDINGS, L.L.C.,

         Debtors

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EVERCORE CAPITAL PARTNERS II, L.L.C.;
GREGG DAVIS; RED MOUNTAIN CAPITAL
PARTNERS, L.L.C.; WILLEM MESDAG;
SANKATY ADVISORS, L.L.C.,

         Appellees

v.

NANCY SUE DAVIS TRUST,

         Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and JOLLY and GARZA, Circuit Judges.

EDITH H. JONES, Circuit Judge:

  Shortly after the renowned patriarch of a family-owned oil and gas drilling business passed away, the business began to suffer financial reverses, and the

family began to squabble. A potential sale of the business was thwarted when one of the adult children filed suit against her mother and siblings. Amid legal trouble and a severe cash shortage, the company finally found refuge in a prepackaged Chapter 11 case in which the debtor entities' assets were sold to an investor consortium including Gregg Davis, one of the sons.[1] The greatly expedited Chapter 11 case was filed and resolved by a confirmation order within less than a week. The family members' equity interests received about $31 million. Represented by a coterie of sophisticated expert legal counsel, all interested parties exchanged releases in the plan of reorganization ("Plan"). The Nancy Sue Davis Trust, appellant here, did not vote for the Chapter 11 plan, but it also declined to register opposition. No one appealed the confirmation order, which became final.

Six months later, Appellant filed a motion to revoke the confirmation order for fraud. *See* 11 U.S.C. § 1144. The Trust alleged that it had recently become aware that Gregg Davis, former advisers to the family including Willem Mesdag, and various representatives of the purchasing entities had engaged in fraud that enabled them to buy out the family's interests far below market value. The bankruptcy court issued a lengthy opinion concluding that no fraud had occurred. On appeal, the district court expressed some misgivings that the motion had been disposed of by summary judgment. The court then elected to vacate the bankruptcy court's ruling while holding the appeal moot on the

---

[1] The Plan lists the Buyer parties as the Davis Petroleum Acquisition Corporation and its subsidiaries and affiliates. These subsidiaries and affiliates included Davis Petroleum Holding Corp.; Davis Offshore Partners, LLC; and Davis Petroleum Investment LLC. These parties were formed as acquisition vehicles by Evercore Capital Partners II, L.P., and its co-investors, including Red Mountain Capital Partners and Sankaty Advisors.

ground that the reorganization plan had been substantially consummated.[2] The Trust declined to appeal.

Instead, the Trust filed a motion with the district court seeking leave not to revoke the confirmation, but to pursue damage claims against Evercore, its affiliate buyers, and the individuals (including Gregg Davis and Willem Mesdag) who it claims perpetrated fraud against the family members' equity interests. The district court referred this motion to the bankruptcy court because the motion required an interpretation of the Plan's releases and exculpatory clause and the scope of its injunctive relief.[3] The bankruptcy judge rejected the motion as an impermissible "collateral attack" on the Plan and confirmation order. The Trust did appeal this decision to the district court, but on the appellees' motion this court certified the appeal for direct review. *See* 28 U.S.C. § 158(d).

The principal question posed on appeal is whether the Plan and confirmation order bar the assertion of fraud claims against the defendants-appellees. This is an issue of perennial importance in bankruptcy procedure. Bankruptcy cases must be and often are resolved in haste to prevent the continuing depletion of a debtor's value and assets. Haste, however, creates the

---

[2] 402 B.R. 203 (S.D. Tex. 2009). Holding the fraud claim equitably moot is novel. In the past, equitable mootness – a judge-made doctrine – has applied to prevent the raising of certain objections to reorganization plans when the plan has been substantially consummated. 11 U.S.C. § 1144, however, is a specific statutory remedy for fraud in connection with a plan. By definition, fraud will rarely be evident at the time of confirmation. Allowing a judicially-crafted doctrine to override this statutory protection seems dubious. *Cf. In re Cont'l Airlines*, 91 F.3d 553, 568-71 (3rd Cir. 1996) (en banc) (Alito, J., dissenting) (questioning foundation of equitable mootness doctrine).

[3] At this court's request, the parties briefed whether the bankruptcy court had jurisdiction over the Trust's motion for leave to file its damage suit post-confirmation. We are persuaded that it had core jurisdiction to interpret the Plan and confirmation order pursuant to 28 U.S.C. § 157(b).

danger that inadequate supervision of deals, valuations, and participants in the process may occur, leaving a fertile field for fraud. To this extent, the demands for finality and integrity in the process may be in tension. In some situations, fraud and related claims may outlive the bankruptcy process. *See generally Browning v. Prostok*, 165 S.W.3d 336 (Tex. 2005) (discussing availability of remedies).

We conclude that in this case, in the context of reorganizing a family-owned company all of whose shareholders had access to sophisticated financial and legal assistance, and where the releases and exculpatory provisions in the Plan and confirmation order were essential to a reorganization that no party appealed, those provisions bar the Trust's current claims.

## STANDARD OF REVIEW

This court interprets the terms of a bankruptcy reorganization plan and confirmation order *de novo* and holistically. *See In re Nat'l Gypsum Co.*, 219 F.3d 478, 484 (5th Cir. 2000). We owe deference to a bankruptcy court's reasonable interpretation of ambiguous terms in the plan, however, if real ambiguity exists. *Id.*[4]

Four distinguished law firms represent the parties to this appeal and have made numerous arguments that are essentially underbrush to the basic question before us. Because it is unnecessary to discuss the superfluous arguments simply for the purpose of rejecting them, we move to the merits. There are two ways in which the Plan and confirmation order may be argued to prevent the Trust from pursuing its damage claims. First, the release and exculpation

---

[4] Appellees are in error, as was the bankruptcy court, to assert that deference is the only applicable review standard. The Supreme Court stated in *Travelers Indemnity Co. v. Bailey*, 129 S. Ct. 2195, 2204 n.4 (2009), that it was not addressing the standard of review for this situation. *In re National Gypsum* clearly sets the standard for this circuit.

4

provisions of the Plan may bar some or all of the claims. Second, because the reorganization orders are final, and revocation of confirmation was denied, the bankruptcy court's findings in connection with the plan's confirmation may be binding on the Trust as a matter of collateral estoppel. The Appellees have raised both defenses, and the Trust disputes them. We reach only the first line of defense.

## DISCUSSION

As was intimated above, it was essential to completing the asset sale to the Buyer Parties under the Plan[5] that comprehensive, binding mutual releases be executed. Two Plan provisions set out mutual releases and exculpation of various parties. Article III. S provides:

### S. Mutual Releases

Upon the Effective Date, <u>except for Causes of Action arising under the Purchase Agreement or the Plan</u>,(i) each of the Buyer Parties shall be deemed to forever waive, release, and discharge any and all Causes of Action against a Debtor Party that is based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan and (ii) <u>in exchange for the preceding release of the Buyer Parties and for the funding of this Plan by Davis Acquisition, each Debtor Party shall be deemed to forever waive, release, and discharge</u> any and all Causes of Action against a Buyer Party that is based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan. (emphasis added).

---

[5] Evercore had agreed pre-bankruptcy to purchase the debtors' assets only to be deterred by the intra-family litigation. One of the other siblings' trusts refused to execute a release, and Evercore walked away, returning to the purchase [for a lower price] because of its reliance on the bankruptcy process to resolve litigation. The bankruptcy court found at confirmation that "failure to effect the . . . release, exculpatory, and injunctive provisions of the Plan would seriously impair the Debtors' ability to confirm the Plan."

5

Article X. D provides:

### D. Exculpation and Limitation of Liability

Neither the Debtors, Parties nor the Buyer Parties shall have or incur any liability to any holder of a Claim or an Interest, the Bank, or any other party in interest, including the Debtor Parties or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding any other provision of this Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Debtors, the Estate(s), the Reorganized Debtors, Buyer Parties, the Liquidating Trustee or any of their respective present or former members, officers, directors, employees, advisors, attorneys, or agents, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence.

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. Each of the Debtor Parties and the Buyer Parties have participated in good faith and in compliance with section 1125(e) of the Bankruptcy Code in the offer and issuance of the New Interests under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the

solicitation of acceptances or rejections of the Plan or the offer and issuance of the New Interests under the Plan.

In addition to the Plan provisions, three paragraphs of the court's confirmation order refer to these Plan provisions. The confirmation order provisions are not exactly like those in the Plan. Yet the bankruptcy court, without any textual exegesis of the Plan or the confirmation order, perfunctorily concluded that "the broader release provisions contained in the confirmation order control over the more restrictive ones found in the Plan." The court then declared the Trust's arguments to be a "collateral attack" on its confirmation order and the Plan and thus precluded by the Supreme Court's recent decision in *Travelers Indemnity Co. v. Bailey, supra.* The Appellees subscribe to this reasoning. We find it deficient.

*Travelers* held that a bankruptcy court's plan confirmation order cannot, after it becomes final, be collaterally attacked by parties to the case or those in privity with them on grounds that it exceeded the bankruptcy court's jurisdiction. The Court reversed the Second Circuit's decision to the contrary. Importantly, *Travelers* was predicated on an order that by its express terms broadly enjoined causes of action against non-debtor third parties. *See* 129 S. Ct. at 2202. The Court, however, refused to decide the "proper standard of review" if the bankruptcy court order had been ambiguous. *See id.* at 2204 n.4. One case the Court cited for the not yet definitively resolved standard of review for ambiguous orders was this court's decision in *In re National Gypsum*, 219 F.3d 478 (5th Cir. 2000).[6] *Travelers* thus forbids an appellate court from refusing to

---

[6] *National Gypsum* interpreted whether a Chapter 11 debtor reorganized into a new corporation had been absolved of liability for asbestos injury claims. The bankruptcy court interpreted the confirmed Chapter 11 reorganization plan to hold the new corporation liable for "unknown claims" including those relating to asbestos torts. We reversed, holding that the new corporation had not assumed liability for the asbestos torts of the former entity. *See*

enforce a final confirmation order because it exceeded the court's jurisdiction when entered, but *Travelers* does not forbid this court from construing the bankruptcy court's order in accord with the principle set out in *National Gypsum*. Nor does *Travelers* answer the additional question posed here, whether a confirmation order that goes beyond the terms of the plan prevails if the two are inconsistent.

To interpret this Plan and confirmation order, we return to *National Gypsum*, which held,

> it is correct that the bankruptcy court's ultimate determination of the meaning of the Plan and Confirmation Order is a legal one; however, the documents must truly be ambiguous, even in light of other documents in the record, before we will defer [to the bankruptcy court's resolution of an ambiguity.]

*Nat'l Gypsum*, 219 F.3d at 484. In this case, the bankruptcy court essentially acknowledged inconsistency, though not necessarily ambiguity, when it stated that the "broader" terms of the confirmation order would control over the Plan. In order to limit the ambit of potential disagreement with the bankruptcy court, we consider first the "narrower" provisions of the Plan.

By its terms, the Mutual Releases provision commits each family member or family trust to release each of the Appellees— except Gregg Davis— from any and all causes of action based, in whole or in part, on any act or omission that occurred before the Plan's Effective Date. The Plan's broad definition of a "Debtor Party" includes the Trust, and "Buyer Party" includes all of the Appellees except Gregg Davis.

The Trust argues that the prefatory clause, "except for Causes of Action arising under the Purchase Agreement or the Plan," excludes the fraud and

---

219 F.3d at 493.

other claims it pled, and it relies on the exclusion of "willful misconduct" from the Exculpation and Limitation of Liability clause. Thus, its fraud claims were neither released nor subject to the exculpatory clause. These arguments are unpersuasive. The misdeeds allegedly perpetrated against the Trust occurred even before the Chapter 11 was filed, when Gregg Davis and the other Appellees allegedly decided to undervalue the companies, allow Evercore to reduce its purchase price, and permit the family's financial advisers to become equity investors in the reorganized company. Indeed, almost all of the complained-of conduct occurred before the Plan's "Effective Date," March 31, 2006–three weeks post-confirmation.[7] Further, because the mutual release includes all claims, "known or unknown, contingent or matured, liquidated or unliquidated," that arose from acts that occurred in whole or in part before the effective date, it does not incorporate the Trust's notion that its claims only "matured" under the Purchase and Sale Agreement or the Plan. Moreover, the Trust's claims did not "arise under" the Purchase and Sale Agreement or the Plan at all: they "arise from" fiduciary, common law and statutory duties.

The Trust's reliance on the willful misconduct exclusion is also misplaced. Willful misconduct is excluded from the general exculpatory clause that binds or protects both Debtor and Buyer parties from claims that might be asserted by other parties to the bankruptcy. The Mutual Releases provision, however, specifically addresses the relations between the Buyer and Debtor parties. The specific provision controls over the general exculpatory provision. A reorganization plan is interpreted as a contract, and in Texas, a specific

---

[7] The petition to revoke confirmation complains of some conduct after the Effective Date, such as Red Mountain Capital Partners' proof of claim filed six weeks post-confirmation, but that conduct all ties to alleged pre-confirmation fraud.

9

contractual provision prevails over a general provision. *E.g.*, *Wolf Hollow I, L.P. v. El Paso Mktg., L.P.*, 329 S.W.3d 628, 640-41 (Tex. App. 2010).

The Plan itself releases all but one of the Appellees from the Trust's claims. Because Gregg Davis was not insulated from the Trust's claims by the Mutual Release, and because his alleged willful misconduct is outside the protection of the Exculpation clause, it becomes necessary to review more closely the Exculpation clause in light of the confirmation order.

Pursuant to established authority concerning third-party releases in bankruptcy, the Exculpation clause does not release Gregg Davis from claims based on acts of "willful misconduct or gross negligence." *See Hilal v. Williams (In re Hilal)*, 534 F.3d 498 (5th Cir. 2008); *Zale Corp. v. Feld*, 62 F.3d 746 (5th Cir. 1995). The Appellees assert, however, that the misconduct with which he is charged related to the solicitation of acceptances of the Plan, and he is separately exonerated by the final paragraph of the Exculpation clause from liability for those acts. Appellees' interpretation of the final paragraph is inaccurate: the paragraph refers specifically to the Debtors, the Debtor parties and the Buyer Parties, none of which defined terms includes Gregg Davis. The final paragraph also concerns the protection afforded by Section 1125(e) of the Bankruptcy Code against liability for securities violations in connection with the confirmation of a plan. *See* 11 U.S.C. § 1125(e). Section 1125(e) is not an umbrella exclusion of fraud liability for reorganization proponents. *See Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995) ("[S]ection 1125(e) only provides a safe harbor for the disclosure and solicitation process of a bankruptcy. In other words, if the securities fraud alleged came from some other source or procedure than disclosure and solicitation, then Section 1125(e) would not provide immunity."). *See also Yell Forestry Prods., Inc. v. First State*

No. 09-41294

*Bank of Plainview*, 853 F.2d 582, 584 (8th Cir. 1988) ("Although section 1125(e) specifies only liability under laws governing securities, we feel that the purpose of section 1125(e) would be defeated if an action could be maintained against a proponent for common law fraud in the sale of securities pursuant to a plan of reorganization.").

Turning to the confirmation order, the relevant paragraphs are 9 and 10:

9. The injunction, release, exculpation and indemnification provisions set forth in the Plan are hereby approved in their entirety and given full effect as of the Effective Date of the Plan. On the Effective Date, except for Causes of Action arising under the Purchase and Sale Agreement or the Plan, and in consideration of the Purchase Price and the transactions set forth in the Purchase and Sale Agreement, (i) each of the Buyer Parties shall be deemed to forever waive, release, and discharge any and all Causes of Action against a Debtor Party that is based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan and (ii) each Debtor Party shall be deemed to forever waive, release, and discharge any and all Causes of Action against all Buyer Parties that is based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan.

10. None of the Debtors, the Debtors' directors, officers, employees, equity holders, members, agents, advisors, accountants, financial advisors, consultants, attorneys, and other representatives shall have or incur any liability to any holder of a claim or equity interest that arose before the Effective Date of the Plan for any act, event, or omission in connection with, or arising out of, these Chapter 11 Cases, or in connection with the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, and shall be entitled to the rights, benefits and protections of Section 1125(e) of the Bankruptcy Code.

Notwithstanding that Gregg Davis lacks a shield for alleged fraud and intentional misconduct under the Plan's Exculpation clause, Appellees contend that Paragraph 10 of the confirmation order "controls over" any limitations in the Plan and squarely releases Gregg Davis. Paragraph 10, in other words, releases him from all liability including willful misconduct or gross negligence. This conclusion is supported by slender legal authority holding that if a Plan and confirmation order conflict, the terms of the court's order are dispositive.[8] The bankruptcy court, as noted, adopted this reasoning.

Three interpretations of the interrelation between the Plan and confirmation order are possible. First, the confirmation order, read as a whole, repeatedly incorporates, ratifies, approves, and adopts the Plan's provisions in addition to making findings required by law to approve the disclosure statement and confirm the plan of reorganization. The introductory sentence to Paragraph 9 approves "in their entirety" the injunction, release, exculpation and indemnification provisions set forth in the Plan and gives them "full effect." Paragraph 9 goes on to summarize the mutual releases provision of the Plan. If that were all, the most logical reading of the Order would be that it incorporates and paraphrases but does not intentionally deviate from the Plan's Mutual Releases and exculpatory provisions. This interpretation would leave Gregg Davis exposed to a fraud or willful misconduct suit by the Trust.

The second potential interpretation is that although the release and exculpatory language in the Plan are straightforward, the confirmation order's meaning with respect to those provisions is ambiguous. For despite the serial

---

[8] *See Guardian Sav. & Loan Ass'n v. Arbors of Hous. Assocs. Ltd. (In re Arbors of Houston Assocs. Ltd.)*, No. 97-2099, 1999 U.S. App. LEXIS 162, at *11 (6th Cir. Jan. 4, 1999); *In re Forklift LP Corp.*, 363 B.R. 388, 396 (Bankr. D. Del. 2007); *In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 367 (E.D. Pa. 1996); *In re Reisher*, 149 B.R. 372, 374 (Bankr. M.D. Pa. 1992).

incorporation and adoption of the Plan's terms, and the mere restatement of the substance of the Mutual Releases in Paragraph 9, Paragraph 10 of the confirmation order differs from the Plan's exculpatory provision by (a) excluding Buyer Parties from its ambit, (b) not excluding acts of willful misconduct or gross negligence, and (c) arguably constricting the reference to the liability shield found in Section 1125(e) of the Bankruptcy Code. Gregg Davis, as an officer of the debtor Davis Petroleum Corporation, falls within the exculpatory language of paragraph 10 although the Trust's allegations of willful misconduct would eliminate his protection by the Plan's exculpatory provision.

The third interpretation is that the bankruptcy court expressly broadened the exculpation of parties related to the Debtor in Paragraph 10, by omitting the exception for willful misconduct and gross negligence, and thereby created a conflict with the Plan's exculpatory clause.

We conclude that the second interpretation makes the most sense under the circumstances. The Plan and confirmation order are ambiguous regarding the scope of Gregg Davis's release or exculpation. Although *National Gypsum*, presupposing the bankruptcy court's greater familiarity with the details of the case, would ordinarily counsel deference to the court's resolution of the ambiguity, deference is not in order here. The court did not rule based on his understanding of the facts and circumstances: he held as a matter of law that the confirmation order took precedence over the plan. This holding is wrong, as will be explained. We cannot defer to an order premised on an erroneous view of the law *See, e.g., Self v. Collins*, 973 F.2d 1198, 1203 (5th Cir. 1992); *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 703 (5th Cir. 1981).

The bankruptcy court's statement that the confirmation order must always prevail over the terms of a conflicting plan is wrong on several counts. First,

13

only minimal and non-controlling legal authority is advanced to support this holding. Far more important, allowing an order of confirmation always to trump the plan, if the two documents are in conflict, encourages errors and abuse. In the flurry of activity that normally precedes plan confirmation, the parties have more likely negotiated and studied the terms of the plan itself than the often boilerplate language embodied in the court's order of confirmation. It is also not unusual for a plan to be modified before the confirmation hearing, yet the confirmation order, whether drafted by the parties or the court alone, might not reflect last-minute changes. An error in the confirmation order should not overcome the parties' negotiated deal.

Moreover, allowing the order of confirmation to stand alone, separate and apart from the plan, in the interpretive process, would tempt parties to insert other provisions in the confirmation order that might not coincide with a plan and, on occasion, might not even comport with the Bankruptcy Code. The drafting of exculpatory clauses is particularly susceptible to such alterations, as the plan proponents will often seek broader liability protection than the Bankruptcy Code or this court allows, while an objecting party may not notice the provision until the eve of confirmation.[9] *See, e.g., In re Pac. Lumber Co.*, 584 F.3d 229, 251-52 (5th Cir. 2009); *Hilal v. Williams (In re Hilal)*, 534 F.3d 498, 501 (5th Cir. 2008). Bankruptcy participants should not be encouraged to toy with the terms of a confirmation order to gain leverage as the plan is carried out.

The bankruptcy court's holding is also in some tension with *National Gypsum*, insofar as it would substitute arbitrary enforcement of a confirmation

---

[9] For reasons to be articulated, we do not find that the Order's exculpatory clause in this case represented such an abuse.

order over a reasoned resolution of conflicting terms in the court's order and the plan. For these reasons, we confront the ambiguity between the Plan and confirmation order but neither defer to the bankruptcy court's result nor adopt its erroneous holding. Nevertheless, we resolve the ambiguity by holding that Gregg Davis was exonerated from personal liability even for fraud by paragraph 10 of the confirmation order. Paragraph 10, read alone, lends itself to this interpretation. Significantly, this interpretation is consistent with the essential goal of the Plan to end all litigation that might stand in the way of the sale of the assets and provoke continued hemorrhaging of the debtors' cash. Neither the Plan nor confirmation order was foisted on the Trust, despite its assertion that the rush to confirmation precluded careful review of the transaction. The Trust was at all times represented by sophisticated counsel and was routinely included in correspondence among family members and their counsel. All parties were aware that intra-family litigation would prevent preservation of the assets. The Court's unappealed confirmation order accommodates the manifest purpose of this Chapter 11 case. This is the most reasonable way to resolve the ambiguity.

The Trust's response to our interpretation, other than to deny the existence of ambiguity between the Exculpatory Clause and Paragraph 10, is to urge that the integrity of the bankruptcy process compels that fraud be excluded from release by the confirmation order. No doubt this would be a sound position to argue—on appeal of the confirmation order or of the denial of the Section 1144 motion to revoke confirmation. The Trust, however, forewent its challenge to the language of the Order while that language could have seasonably been altered. It is too late to do so now. *See Travelers Indem. Co., supra*, 129 S. Ct. at 2198; *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) ("Questions of the propriety or legality of the bankruptcy court confirmation order are indeed properly addressable on direct appeal.").

15

No. 09-41294

## CONCLUSION

Crafted under the constraints of emergency relief required by the debtors and intra-family conflict, the reorganization process in this case is no ideal model, nor are the Plan and confirmation order iconic. Nevertheless, all family members, including the Trust, were continuously represented by sophisticated counsel and could have elected zealously to pursue their remedies under Chapter 11 rather than succumb to the hasty process that occurred. The judgment of the bankruptcy court denying the Trust's motion to pursue its claims against the Appellees is **AFFIRMED**.